J-S36012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| LEON WATSON | |
| Appellant | No. 3250 EDA 2015 |

Appeal from the Judgment of Sentence September 11, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001136-2014
CP-51-CR-0001141-2014
CP-51-CR-0001142-2014
CP-51-CR-0001143-2014
CP-51-CR-0001144-2014
CP-51-CR-0001145-2014

BEFORE:  PANELLA, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED AUGUST 03, 2017**

Appellant, Leon Watson, appeals from the judgment of sentence entered after a jury convicted him of multiple crimes arising from the sexual abuse of five juvenile victims and one adult victim. We affirm.

In 2013, Watson was arrested and charged with Sexual Assault,[1] Involuntary Deviate Sexual Intercourse ("IDSI"),[2] three counts of IDSI with

---

[1] 18 Pa.C.S.A § 3124.1.

[2] 18 Pa.C.S.A § 3123 (a)(1).

a Child,[3] five counts of Corruption of Minors,[4] five counts of Unlawful Contact with a Minor,[5] and two counts of Indecent Assault,[6] relating to the sexual abuse of five juveniles, I.B., K.B., B.J., R.C., and D.J., and one mentally disabled adult, J.H.[7] The Commonwealth alleged that Watson used his position as coach of the "Little Vicks" football team to find his victims and gain their trust.

Prior to trial, the Commonwealth filed motions to consolidate the five juvenile victim's cases with the adult victim's case and admit Watson's juvenile history of previous sexual offenses. Watson filed a response opposing the motion to admit evidence of the previous sexual offenses citing the remoteness in time. Further, Watson opposed the Commonwealth's motion to consolidate the victims' cases and moved to sever the adult victim's case from the juvenile victims' cases. The trial court granted the Commonwealth's motions and denied Watson's motion to sever.

---

[3] 18 Pa.C.S.A § 3123(b).

[4] 18 Pa.C.S.A § 6301(a)(1)(ii).

[5] 18 Pa.C.S.A § 6318(a)(1).

[6] 18 Pa.C.S.A § 3126(a)(7).

[7] The Commonwealth also charged Watson with additional crimes related to these allegations. However, these additional charges were disposed of prior to trial.

The consolidated cases proceeded to a jury trial on January 12, 2015. As part of its case in chief, the Commonwealth presented the testimony of all six victims, I.B., K.B., B.J., R.C., D.J., and J.H. Further, the Commonwealth introduced the testimony of Michael Wood, Watson's brother, and an admission made by Watson relating to Watson's juvenile court adjudication for sexual offenses in 2005.

The jury convicted Watson of all charges relating to all six victims. The trial court subsequently sentenced Watson to an aggregate sentence of 114 to 228 years' imprisonment, followed by 35 years' of probation.[8] Watson filed a timely post-sentence motion, which the trial court denied. This timely appeal follows.

Prior to reaching the merits of Watson's issues, we must first determine whether Watson has preserved an issue for our review. In his appellate brief, Watson contends that the trial court infringed upon his constitutional right to remain silent at sentencing by compelling him to

_____

[8] Watson was sentenced to 10 to 20 years' imprisonment for IDSI, 20 to 40 years' imprisonment for each of the three counts of IDSI with a Child, 10 to 20 years' imprisonment for each of three of the counts of Unlawful Contact with a Minor, 3½ to 7 years' imprisonment for each of the remaining two counts of Unlawful Contact with a Minor, and 3½ to 7 years' imprisonment on each of the two counts of Indecent Assault. The trial court ordered these sentences to run consecutively. The conviction for Sexual Assault merged with IDSI. Further, Watson was sentenced to seven years of probation for each of the five counts of Corruption of a Minor. The trial court ordered these probationary sentences to run consecutive to Watson's prison term and consecutively to each other.

testify and that the trial court used his attempted silence against him in fashioning his sentence. **See** Appellant's Brief, at 4, 29-36. However, we find these discretionary aspects of sentencing claims waived as Watson failed to raise this challenge with the trial court.

"[W]e note that issues, even those of constitutional dimension are waived if not raised in the trial court." **Commonwealth v. Berryman**, 649 A.2d 961, 973 (Pa. Super. 1994) (citations omitted). **See also** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.") Here, at his sentencing hearing and in his motion to reconsider sentence, Watson failed to raise the claims that the trial court violated his constitutional right to remain silent and that it improperly considered his silence in fashioning his sentence. **See** N.T., Sentencing, 9/11/15; Post Sentence Motion: Motion to Reconsider Sentence, 9/18/15. Thus, we find this issue waived. We proceed to address the remaining issues.

In his first preserved issue on appeal, Watson contends the trial court erred by permitting the Commonwealth to ask questions in front of the jury that established the minor victims' competency. **See** Appellant's Brief, at 4, 25-29. Watson claims that this questioning violated the dictates of the *per se* rule set forth in **Commonwealth v. Washington**, 772 A.2d 643 (Pa. 1998), and therefore requires a new trial. **See** Appellant's Brief, at 27-29.

Under Pennsylvania law, the competency of witnesses over the age of fourteen is generally presumed. *See Commonwealth v. Delbridge*, 855 A.2d 27, 39 (Pa. 2003). However, trial courts must inquire into the competency of witnesses under the age of fourteen to ensure that the witness has the mental capacity "to perceive the nature of the events about which he or she is called to testify, to understand questions about that subject matter, to communicate about the subject at issue, to recall information, to distinguish fact from fantasy, and to tell the truth." *Id*., at 45. The competency of juvenile witnesses is a matter solely within the purview of the trial court. *See Commonwealth v. Dowling*, 883 A.2d 570, 576 (Pa. 2005).

As the trial court is the sole judge of competency, the defendant in *Washington* questioned the appropriateness of inquiring into a juvenile witness's competency in the presence of the jury. *See* 722 A.2d at 645. There, the trial court allowed counsel to conduct a lengthy *voir dire* of the juvenile witnesses in the presence of the jury. *See id*., at 644-645. Following *voir dire*, defense counsel objected to the juvenile witness's competency, but the trial court overruled the objection and specifically informed the jury that the witness was competent to testify. *See id*., at 645. The defendant argued that allowing the jury to witness the *voir dire* and hear the competency ruling implied that the trial court endorsed the witness's credibility. *See id*. Our Supreme Court agreed and set forth a *per*

*se* rule "requiring the trial court to conduct a competency hearing in the absence of the jury." 722 A.2d at 647.

However, our Supreme Court clarified the boundaries of this *per se* rule in **Commonwealth v. Hutchinson**, 25 A.3d 277 (Pa. 2011). In **Hutchinson**, the Court clarified that not all questioning which mirrors the *voir dire* of juvenile witnesses violates the *per se* **Washington** rule. **See id**., at 296. Specifically, the Court found that the prosecutor's inquiry into the juvenile witness's ability to differentiate between the truth and a lie in the presence of the jury did not violate the *per se* **Washington** rule where the trial court refrained from ruling on the juvenile witness's competency in the presence of the jury, and later instructed the jury that it was the sole judge of credibility. **See Hutchinson**, 25 A.3d at 295.

Here, the circumstances of the competency hearings closely aligns with the facts set forth in **Hutchinson**. For each juvenile victim, the trial court correctly conducted a competency hearing *outside* of the presence of the jury. **See** N.T., Jury Trial, 1/12/15, at 105-107 (relating to B.J.); N.T., Jury Trial, 1/13/15, at 5-7 (relating to K.B.), 8-9 (relating to I.B.), 89-91 (relating to D.J.), 92-93 (relating to R.C.). Watson did not challenge the competency of any of the juvenile victims at the time of trial (or now on direct appeal).

Upon direct examination, the Commonwealth asked each juvenile victim to recite his age, birthday, and to confirm their understanding of the

difference between the truth and a lie.[9] **See** N.T., Jury Trial, 1/12/15, at 125-126 (relating to B.J.); N.T., Jury Trial, 1/13/15, at 10-11 (relating to K.B.), 57-58 (relating to I.B.), 94 (relating to D.J.), 108-109 (relating to R.C.). The Commonwealth then proceeded to ask questions directly related to the charged crimes. These competency-like questions flowed smoothly into the rest of each juvenile victim's testimony. The trial court did not discuss the issue of competency in front of the jury in relation to any of the juvenile victims. Further, the trial court expressly instructed the jury on *its* duty as the *sole* fact finder and judge of credibility. **See** N.T., Jury Trial, 1/15/15, at 125. There is no evidence that the jury did not follow this instruction, and, as such, we must presume that they did so in this matter. **See Hutchinson**, 25 A.3d at 299. As such, Watson is not entitled to relief on this claim.

Next, Watson contends that two improper decisions of the trial court combined to paint Watson as an "uncontrollable sexual predator." Appellant's Brief, at 37. First, Watson claims the trial court erred in denying his motion to sever and by consolidating the charges relating to the five juvenile victims with the charges relating to the adult victim for trial. **See id**., at 36-39. Watson avers that this error, coupled with Watson's next

---

[9] The record reveals that the Commonwealth also asked B.J. and I.B. their grade in school in the presence of the jury. **See** N.T., 1/12/15, at 125; N.T., 1/13/15, at 58. This additional question does not alter our analysis of the issue.

alleged trial court error of admitting evidence of Watson's juvenile sexual offenses, deprived Watson of a fair trial and necessitates a new trial. *See id*., at 39-41.

> [A] motion for severance is addressed to the sound discretion of the trial court, and … its decision will not be disturbed absent a manifest abuse of discretion. The critical consideration is whether [the] appellant was prejudiced by the trial court's decision not to sever. [The a]ppellant bears the burden of establishing such prejudice.

*Commonwealth v. Dozzo*, 991 A.2d 898, 901 (Pa. Super. 2010) (citation omitted; brackets in original).

In order to address Watson's contention, we must determine

> [1] whether the evidence of each of these offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative; [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Commonwealth v. Boyle*, 733 A.2d 633, 635 (Pa. Super. 1999) (citation omitted; alterations in the original). *See also* Pa.R.Crim.P. 582 and 583.

Our first step is to determine whether the evidence regarding each incident would be admissible in a separate trial for the other. "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002) (citation omitted). However, it is impermissible to present evidence at trial of a defendant's prior bad acts or crimes in an attempt to establish the defendant's criminal character or proclivities. *See Commonwealth v.*

- 8 -

*Hudson*, 955 A.2d 1031, 1034 (Pa. Super. 2008); Pa.R.E. 404(b)(1). Such evidence, however, may be admissible "where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Commonwealth v. Russell*, 938 A.2d 1082, 1092 (Pa. Super. 2007) (citation omitted). "[E]vidence of other crimes, wrongs or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or lack of accident." Pa.R.E. 404(b)(2).

Watson concedes that the evidence of the abuse of the juvenile victims would be admissible in separate trials for the others, and does not contest the trial court's decision to consolidate the juvenile cases for trial. *See* Appellant's Brief, at 36. However, he challenges the trial court's conclusion that the evidence admitted in the trial relating to the juvenile victims would be admissible at the trial as evidence of a common plan or scheme for J.H., the sole adult victim, and vice versa. *See id*., at 36-39.

In determining whether the common plan or scheme exception applies, a trial court must assess the distinctiveness of similarity of the circumstances of the two incidents to determine whether they constitute a "signature." *Commonwealth v. Tyson*, 119 A.3d 353, 358-359 (Pa. Super. 2015) (citations omitted). A signature does not necessitate proof of nearly identical facts, but requires that there be a "logical connection between [the crimes.]" *Commonwealth v. Ivy*, 146 A.3d 241, 254 (Pa. Super. 2016). Next, the court must assess the lapse of time between the incidents, as a

prior bad act that is remote in time may not be probative of a common plan. *See Tyson,* 119 A.3d at 358-359. Finally, the court must determine that the probative value of the prior bad act evidence is not outweighed by the prejudicial impact on the trier of fact. *See id*.

Here, the circumstances surrounding the separate allegations of sexual abuse were set forth through the testimony of the victims, as accurately summarized by the trial court as follows:

> B.J. is an eleven-year-old child who played football for the Little Vicks and the Rhawnhurst Raiders. B.J. stated that [Watson] was the assistant coach of the Rhawnhurst Raiders and in charge of the Little Vicks. B.J. testified that he would sometimes spend the entire weekend at [Watson's] house and sleep in [Watson's] bed. B.J. stated that he, K.B., I.B., and sometimes D.J. and R.C. would sleep in the same bed with [Watson]. B.J. testified that [Watson] would touch their private parts and that [Watson] would put his private part in [B.J.'s] butt. [Watson's] private part would go in B.J.'s mouth and "some white stuff" would come out of [Watson's] private part when he was "doing it" to [B.J.] B.J. stated that this happened more than one time. B.J. was too scared to tell [Watson] that it hurt because he thought that [Watson] would hit him.
>
> The Commonwealth next called K.B. to testify. K.B. is an eleven-year-old child who also played football with the Rhawnhurst Raiders and the Little Vicks. K.B. testified that in 2013 he lived at … Street with his brother I.B., [Watson], [Watson's] mother, father, and mother's boyfriend. He testified that while he lived with [Watson], [Watson] would touch him inappropriately. [Watson] would take his penis and rub it against K.B.'s butt or penis almost every night. K.B. stated that [Watson] would sometimes suck his penis and that after a while [Watson's] sperm would come out of his penis and land on K.B.'s butt or penis. K.B. thought about telling his mother but he was scared that his family would get hurt. K.B. testified that he witnessed this happen to R.C., I.B., and B.J.

The Commonwealth next called I.B. to testify. I.B. is a nine-year-old child who played on the Little Vicks. I.B. testified that [Watson] would put his mouth on his private part and sometimes in his butt. He stated that white and clear stuff would come out of [Watson's] penis and go on [I.B.'s] back and stomach and that this happened more than one time. I.B. said that he did not tell anyone about what was happening because [Watson] had a knife and taser and he thought [Watson] would use them on him.

The Commonwealth next called D.J. to testify. D.J. is an eleven-year-old child who played on the Little Vicks. He states that he went over to [Watson's] house when he got suspended from school because no one could look after him at his own home. D.J. testified that [Watson] touched him on the chest, butt, and private part when he was over [Watson's] house that day. D.J. stated that he slept over [Watson's] house but in a different bed than [Watson]. He testified that he would see [Watson] "wrestle" K.B. and I.B. in [Watson's] bed.

The Commonwealth next called R.C. to testify. R.C. is a ten-year-old child who played on the Little Vicks. He testified that he slept over [Watson's] house about nine times. R.C. would sleep in [Watson's] bed when he slept over. R.C. stated that [Watson] touched him on his butt when he was in the kitchen getting breakfast. [Watson] also touched R.C. on his "nuts" over his clothes in the bedroom and [R.C. stated] that this occurred about two or three times. R.C. did not tell anybody because he was scared he would get in trouble with his mom.

***

The Commonwealth next called J.H. to testify. J.H. is twenty-four years old and mentally challenged. J.H. testified that he lives with Ryan O'Neal and that something bad happened there with [Watson]. [] O'Neal works for JEVS Human Services, which is a program that supports people with intellectual disabilities or mental retardation through housing and employment opportunities. [] O'Neal lives in a house on Wellington Street where [Watson] resided for a few months from late 2012 to early 2013. J.H. was part of this JEVS program. J.H. stated that [Watson] raped him and that it happened six times. J.H. explained that he was too scared to tell anyone what was going on because he was scared of [Watson]. [Watson] held

J.H.'s arms down and put his penis in J.H.'s butt until a "white thing" would come out of [Watson's] penis. [Watson] also forced his penis into J.H.'s mouth until a "white thing" would come out. While this was going on, [Watson] would look out the window to make sure [] O'Neal was not coming home.

Trial Court Opinion, 5/27/16, at 5-9 (internal citations to the record omitted).

Watson contends this testimony proves that, other than race, the occurrence of sexual contact, and that all acts occurred in bedrooms, there is no clear commonality between the cases involving the juvenile victims, and the case involving the adult victim. *See* Appellant's Brief, at 37. Watson highlights the significant age difference between the juvenile victims and the adult victim; the fact that the assaults on the juvenile victims occurred in his mother's home while Harris's assault occurred in a group home; the fact that J.H.'s assault occurred nine months prior to the juveniles' assaults; and the fact he used restraint in J.H.'s sexual abuse. *See id*., at 38. We disagree.

The record reveals that in all of the assaults, Watson targeted African-American males who he either lived with, or who stayed overnight at his residence. While J.H. was 21 at the time of the assault, all of the testimony indicates that he mentally functioned at a level similar to the five juvenile victims. All six victims were involved in either the Little Vicks or the Rhawnhurst Raiders, which logically suggests that Watson used his position of power as a coach to gain control over his victims. Additionally, all of the assaults occurred within a two-year period, contrary to Watson's assertion

that the assaults were remote in time. Further, while there is no evidence that Watson physically restrained any victim but J.H., this fact alone does not preclude consolidation. Thus, we find that the cases are similar enough to be admitted as evidence in each case if tried separately.

The next step is to determine whether joinder of the offenses for trial posed a danger of confusing the jury. "Where a trial concerns distinct criminal offense that are distinguishable in time, space and the characters involved, a jury is capable of separating the offenses." *Commonwealth v. Collins*, 703 A.2d 418, 423 (Pa. 1997) (citation omitted).

Watson entirely ignores the danger of confusion in his brief. However, the crimes occurred on different days and at different times. Further, the subject matter was rather simplistic and could be easily understood by the jury. Thus, we find that there was no danger of confusing the jury with evidence of each crime.

Finally, we must determine whether joinder of the offenses for trial unfairly prejudiced Watson.

> The "prejudice" of which Rule [583] speaks is not simply prejudice in the sense that appellant will be linked to the crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of *all* Commonwealth evidence. The prejudice of which Rule [583] speaks is, rather, that which would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence.

*Commonwealth v. Newman*, 598 A.2d 275, 279 (Pa. 1991) (citation omitted).

As we stated above, the burden for establishing prejudice falls squarely on Watson. Watson does not even attempt to establish prejudice in his appellate brief. Further, we have already explained that the evidence regarding each sexual assault would be admissible in a separate trial for the other. And we concluded that the jury was capable of separating the evidence of each crime. Thus, we can discern no abuse of discretion in the trial court's denial of Watson's motion to sever, and grant of the Commonwealth's motion to consolidate, all six cases for trial.

In his second prong of this argument, Watson contends the trial court improperly granted the Commonwealth's motion to introduce a juvenile court adjudication, which revealed that he had previously molested children. *See* Appellant's Brief, at 39-41. Specifically, Watson challenges the introduction of evidence relating to sexual abuse he perpetrated in 2005. At that time, he "anally penetrated his then-eight year old brother and vaginally penetrated his then-three year old sister," as well as testimony that "[a]t around the same time period, [Watson] rubbed himself up against [two of his cousins] during a water fight." *Id*., at 39. Watson claims that this evidence is too far removed from the allegations introduced at trial and lacks a signature-like quality necessary to qualify for the common plan or scheme

- 14 -

exception to Pa.R.E. 404(b)(2), and therefore its introduction was impermissible proof of propensity to commit a crime. *See id*., at 41.

As discussed in detail above, we determined that Watson displayed a common plan or scheme that involved sexually assaulting immature African-American children and a mentally disabled adult that trusted him because of their relationship and all of whom were easily accessible as victims for him to sexually abuse. Watson's abuse of his siblings and cousins falls neatly within this general plan or scheme. Watson clearly had access to his younger cousins and his sister and had power over them because of his elder status. Further, Watson's brother, Michael Wood, eighteen at the time of the trial, testified that

> when he was eight years old and [Watson] was sixteen, [Watson] would play the "quiet game" and the "kissing game" with him. During the "quiet game," [Watson] would make Wood lay down and [Watson] would insert his penis inside Wood's anus. During the "kissing game" [Watson] would kiss Wood and make Wood give him oral sex. The "quiet game" would happen almost every day after school and the "kissing game" did not happen too often. Wood testified that roughly three times he saw [Watson] "go on top of" their three year old sister. He stated that he saw [Watson] "stroking up and down on top of her."

Trial Court Opinion, 5/27/16, at 9-10 (internal citations to the record omitted).

Wood's description of the sexual abuse he suffered is strikingly similar to the abuse described by B.S. We find these factual similarities sufficient to establish a logical connection between the cases.

- 15 -

We recognize that Watson is correct in noting that evidence of a common plan or scheme that is too remote in time generally loses its probative value, but we find that, under the particular circumstances here, the evidence of Watson's juvenile sexual offenses are not too remote in time. "If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of evidence unless the time is excessive." *Commonwealth v. Smith*, 635 A.2d 1086, 1089 (Pa. Super. 1983) (citation and emphasis omitted). Further, in evaluating the remoteness of a particular crime intended to be introduced as evidence of a common plan or scheme, "time spent in prison must be excluded in the calculation of how much time has elapsed since the prior crime." *Tyson*, 119 A.3d at 361 (citations omitted).

Watson was in custody for his juvenile sexual offenses from February 2006 until September 2010. He was released from custody into the residential support home where he eventually sexually assaulted J.H. Effectively, there was an approximate three year gap between the instances in which he sexually assaulted his cousins and siblings and the instances in which he assaulted J.H. After his assaults of J.H., he began sexually assaulting the five juvenile victims within the year time.

We do not find that these lapses in time removed the probative value of evidence of a common plan or scheme. *See id*., at 361 (finding five-year

"look-back period" not too remote and citing cases where ten-year and six year-lapses were not too remote). Additionally, we do not find that the trial court abused its discretion in determining that the probative value of Watson's prior sexual offenses outweighed its potential for undue prejudice. Given the substantial similarities between the sexual assaults, it was reasonable to find the previous assaults highly probative. Accordingly, Watson's challenge to the admission of evidence relating to his juvenile adjudication for sexual assaults is without merit.

In his final argument, Watson contends that the trial court abused its discretion in imposing sentence. **See** Appellant's Brief, at 20-24, 41-51. Watson relies upon two arguments to support this contention.[10] First, Watson contends that the trial court abused its discretion by sentencing him to aggravated range and "outside the aggravated range" sentences on every count and running the sentences consecutively, essentially creating a life sentence. **See id**., at 22-23. Second, Watson contends that the trial court abused its discretion by failing to adequately justify the reasons for its

_____

[10] We have rearranged Watson's arguments for ease of disposition. Additionally, through his challenge to the discretionary aspects of his sentence, Watson attempted to raise a third argument: that the trial court abused its discretion by construing his constitutional right to remain silent as a lack of remorse, and using that alleged lack of remorse against him in sentencing. **See** Appellant's Brief, at 20. However, as we have discussed above, Watson waived this challenge by failing to object to this alleged error at sentencing or in his motion to reconsider his sentence. Thus, we will not address this waived issue in the context of his challenge to the discretionary aspects of his sentence.

sentence on the record at sentencing and by failing to consider mitigating factors. *See id*., at 20-21. Watson concedes that both of these challenges implicate the discretionary aspects of the trial court's sentence.

Preliminarily, we note that Watson's contention that the trial court sentenced him to both aggravated range and "outside the aggravated range" sentences mischaracterizes the trial court's sentencing scheme. Specifically, in his Rule 2119(f) statement, Watson incorrectly alleges that the trial court imposed aggravated range sentences for the three counts of IDSI of a Child, and for the three corresponding counts of Unlawful Contact with a Minor.[11] *See* Appellant's Brief, at 22 n.16. At the sentencing hearing, both parties agreed, correctly, *see* 204 Pa. Code. § 303.15, that Watson's prior record score was four and an offense gravity score of 14 for each these six counts. *See* N.T., Sentencing, 9/11/15, at 7-8. Based upon these numbers, a standard range sentence for any of these charges would include a minimum sentence ranging from 14 years' to the statutory limit of 20 years' imprisonment. *See* 204 Pa. Code. § 303.16(a). Thus, Watson's minimum sentence of 10 years' imprisonment for each of three counts of Unlawful Contact with a Minor is *below* the standard range. *See id*. Further, while Watson's minimum sentence of 20 years' imprisonment for IDSI of a Child is

_____

[11] Peculiarly, Watson later concedes that the three sentences of 20-40 years' imprisonment that he received for the ISDI with a Child were standard range sentences. *See* Appellant's Brief, at 48.

- 18 -

the statutory maximum, it is also a standard range sentence for Watson. *See id*. Despite this mischaracterization, we will address this claim as the trial court did sentence Watson to five sentences outside the guidelines.[12]

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." *Commonwealth v. McAfee*, 849 A.2d 270, 274 (Pa. Super. 2004) (citation omitted). "Two requirements must be met before we will review this challenge on its merits." *Id*. (citation omitted).

"First, an appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence." *Id*. (citation omitted). *See also* Pa.R.A.P. 2119(f). "Second, the appellant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code." *Id*. (citation omitted). That is, "the sentence violated either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process." *Commonwealth v. Tirado*, 870 A.2d 362, 365 (Pa. Super. 2005) (citation omitted).

---

[12] The trial court's sentence of 3½ to 7 years' imprisonment for the remaining two counts of Unlawful Contact with a Minor, as well as the two counts of Indecent Assault, were outside the standard range of the guidelines, but within the statutory limits. *See* 204 Pa. Code. § 303.16(a). This is also true for Watson's sentence of 10 to 20 years' imprisonment for IDSI. *See id*.

We examine an appellant's Rule 2119(f) statement to determine whether a substantial question exists. ***See id***. "Our inquiry must focus on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." ***Id***. (citation omitted). Here, Watson has preserved his arguments through a post-sentence motion and his appellate brief contains the requisite Rule 2119(f) concise statement.

We will first address Watson's erroneous contention that the trial court abused its discretion by sentencing him to aggravated range and "outside the aggravated range" sentences on every count and running the sentences consecutively, essentially creating a life sentence. Essentially, through this argument, Watson is objecting to the consecutive nature of his sentence. We find that this argument fails to raise a substantial question for our review.

"Although Pennsylvania's system stands for individualized sentencing, the court is not required to impose the 'minimum possible' confinement." ***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa. Super. 2010) (citation omitted). "Generally, Pennsylvania law affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed. Any challenge to the exercise of this discretion ordinarily does not raise a substantial question." ***Commonwealth v. Austin***, 66 A.3d 798, 808 (Pa. Super. 2013). ***See also*** 42 Pa.C.S.A. § 9721(a); ***Commonwealth v. Hoag***,

665 A.2d 1212, 1214 (Pa. Super. 1995) (stating that an appellant is not entitled to a "volume discount" for his crimes by having all sentences run concurrently). "The imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." *Moury*, 992 A.2d at 171-72 (citation omitted).

We do not find that an "extreme circumstance" is present here. The trial court acted well within its discretion in imposing consecutive sentences. Although we do not deny that Watson's aggregate sentence is lengthy, Watson concedes that it is a legal sentence. Given the egregious nature of the sexual abuse of six individuals in this matter, five of whom were children, we agree with the trial court's conclusion that a sentence of 114 to 128 years' imprisonment, followed by a 34-year probationary tail is reasonable under the circumstances and not excessive. Thus, Watson's first challenge to the discretionary aspects of his sentence is without merit; it does not even raise a substantial question for our review.

Finally, Watson argues in his Rule 2119(f) statement that the trial court abused its discretion by failing to state adequately the reasons for its sentence on the record and by ignoring mitigating circumstances, such as his diagnosis of mild mental retardation, his history of abuse in childhood, and his rehabilitative needs. *See* Appellant's Brief, at 20-21. We have

previously held that this claim raises a substantial question for our review.

*See Commonwealth v. Caldwell*, 117 A.3d 763, 770 (Pa. Super. 2015)

(*en banc*), *appeal denied*, 126 A.3d 1282 (Pa. 2015). *See also*

*Commonwealth v. Parlante*, 823 A.2d 927, 929-930 (Pa. Super. 2003)

(holding that failing to adequately state reasons on the record coupled with

failure to consider rehabilitative needs raises a substantial question).

> The standard of review with respect to sentencing is as follows. Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006)

(citation omitted).

We first note that at Watson's sentencing, the trial court was provided

with a pre-sentence investigation report ("PSI"). Where the sentencing court

had the benefit of reviewing a PSI, we must

> presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself. In order to dispel any lingering doubt as to our intention of engaging in an effort of legal purification, we state clearly that sentencers are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed. This is particularly true, we repeat, in those circumstances where it can be demonstrated that the judge had any degree of

awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion. It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand.

***Commonwealth v. Hallock***, 603 A.2d 612, 616 (Pa. Super. 1992) (citation omitted).

In addition to the PSI, which highlighted Watson's claims of mental disability and childhood abuse, defense counsel argued at sentencing that Watson's troubled childhood and "mild mental retardation" evidenced a need for rehabilitative efforts. N.T., Sentencing, 9/11/15, at 10-14. While it is clear from the record that Watson had an extremely difficult childhood and mental deficiencies, there is no indication that the trial court completely disregarded this information in fashioning a sentence. In fact, the trial court acknowledged Watson's claims during sentencing, but indicated that he did not believe rehabilitation would be successful, as Watson had already been given the opportunity for "treatment and rehabilitation … by the juvenile justice system" and "went AWOL [from] sexual offender treatment several times." ***Id***., at 38, 41. We therefore conclude that the trial court considered the appropriate factors when sentencing Watson, and therefore did not abuse its discretion. Thus, Watson's final issue on appeal merits no relief.

Judgment of sentence affirmed.

President Judge Emeritus Ford Elliott joins in the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/3/2017